1  NICOLA T. HANNA
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   MACK E. JENKINS (Cal. Bar No. 242101)
4  Assistant United States Attorney
   Chief, Public Corruption & Civil Rights Section
5  MAX B. SHINER (Cal. Bar No. 187125)
   WILSON PARK (Cal. Bar No. 239527)
6  ARON KETCHEL (Cal. Bar No. 250345)
   Assistant United States Attorneys
7  Violent & Organized Crime Section
        1500/1300 United States Courthouse
8       312 North Spring Street
        Los Angeles, California 90012
9       Telephone: (213) 894-2091/3308/5796/1019
        Facsimile: (213) 894-6436/3713
10      E-mail:   mack.jenkins@usdoj.gov
                  max.shiner@usdoj.gov
11                wilson.park@usdoj.gov
                  aron.ketchel@usdoj.gov
12
   Attorneys for Plaintiff
13 UNITED STATES OF AMERICA

14                 UNITED STATES DISTRICT COURT

15              FOR THE CENTRAL DISTRICT OF CALIFORNIA

16 UNITED STATES OF AMERICA,            No. CR 14-338(B)-SJO-31

17          Plaintiff,                  GOVERNMENT'S POSITION REGARDING
                                        PRESENTENCE INVESTIGATION REPORT
18          v.                          FOR DEFENDANT ANTHONY INGRAM;
                                        EXHIBITS 5, D, F-I, M-N, Q, T-U
19 TYRINE MARTINEZ, et al.,
     [ANTHONY INGRAM]                   (EXHIBITS A-C, E, J-L, O-P, R-S
20                                      FILED SEPARATELY UNDER SEAL)
            Defendants.
21                                      Sentencing Date:    1/14/2019
                                        Sentencing Time:    9:00 a.m.
22

23

24       Plaintiff United States of America, by and through its counsel

25  of record, the United States Attorney for the Central District of

26  California, hereby files its position regarding the presentence

27  investigation report ("PSR") for defendant Anthony Ingram

28  ("defendant").

This position is based on the attached memorandum of points and authorities, the attached exhibits, the PSR, the exhibits and record from defendant's trial, the files and records in this case, and such further evidence and argument as the Court may permit.


Dated: December 21, 2018          Respectfully submitted,

                                  NICOLA T. HANNA
                                  United States Attorney

                                  LAWRENCE S. MIDDLETON
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  ____/s/ Wilson Park_____
                                  MACK E. JENKINS
                                  MAX B. SHINER
                                  WILSON PARK
                                  ARON KETCHEL
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   SENTENCING GUIDELINES.......................................3

      A.    PSR's Calculations....................................3

      B.    Government's Objections to the PSR....................4

            1.    Failure to Include or Reference Trial Exhibits
                  and Testimony....................................4

            2.    Failure to Apply U.S.S.G. § 2D1.1 (the Drug
                  Trafficking Guideline)..........................10

      C.    Government's Recommended Sentencing Guidelines Range.....21

III.  STATUTORY MINIMUM AND MAXIMUM SENTENCES....................21

IV.   GOVERNMENT'S RECOMMENDATION................................22

      A.    The 3553(a) Factors Compel a 24-Month Sentence to
            Reflect Defendant's Decades-Long History of Crack
            Cocaine Trafficking With the Broadway Crips.............22

V.    CONCLUSION.................................................25

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   <u>INTRODUCTION</u>**

Of the 72 defendants convicted in this racketeering case against the Five Deuce Broadway Gangster Crips ("BGC" or "Broadway Crips"), defendant Anthony Ingram stands out in one important respect.  He was, in many ways, the gang member who most easily could have walked away from the gang life; walked away from being a crack cocaine dealer; and walked away from the guns and violence that go hand in hand with being a member of one of South Los Angeles' most violent gangs.  But rather than walk away, defendant made the deliberate choice to live a double life.  In one life, defendant lived with his family outside of the gang's territory and worked a well-paying, legitimate job with the City of Los Angeles.  In his other life, however, defendant was an active OG (original gangster) of the Broadway Crips, who operated and managed drug houses in the gang's territory (where he often spent nights), and from which he and other BGC members sold crack cocaine, marijuana, and firearms.

On March 5, 2018, following an 18-day trial, a jury found defendant, also known as ("aka") "Big Cartoon," aka "Big Toon," guilty of a lesser included offense in count 11 of the second superseding indictment.[1]  (Dkt. #s 3310, 3320.)  Specifically, the jury convicted defendant of conspiracy to possess crack cocaine, in violation of 21 U.S.C. §§ 844, 846, based on defendant's purchase of approximately 63 grams of crack cocaine (over a two-and-a-half week period) from the gang's crack cocaine wholesalers, i.e., co-

---

[1] The jury acquitted defendant of counts one (racketeer influenced and corrupt organizations ("RICO") conspiracy) and 11 (conspiracy to traffic controlled substances) of the second superseding indictment.

1

defendants Tyrine Martinez and Roosevelt Sumpter.  (PSR, ¶¶ 2, 12-13.)  The evidence presented at trial established that defendant purchased this crack cocaine for the purpose of re-selling it to drug-addicts who served as the gang's clientele and profit center.

On May 3, 2018, the United States Probation Office ("USPO" or "Probation Office") filed the PSR, in which it calculated a total offense level of eight, a criminal history category of III, and a Sentencing Guidelines range of six to 12 months of imprisonment. (PSR, p. 4.)  The USPO did not publically disclose its sentencing recommendation.  However, in the PSR, the USPO indicated that it had not identified any factors that would warrant a departure or variance from the applicable Guidelines range.  (Id., ¶¶ 120-21.)

Although the government concurs with the USPO's calculation of criminal history category, it objects, for the reasons detailed below, to the USPO's Guidelines calculations, as well as the PSR's failure to include or even reference the evidence that was admitted during defendant's trial.  Thus, in significant contrast with the USPO, the government calculates a total offense level of 36 and a Guidelines range of 235 to 293 months of imprisonment.  However, since the statutory maximum for defendant's offense of conviction is 24 months, the government recommends that the Court sentence defendant to 24 months of imprisonment, followed by a supervised release period of one year with the following special conditions: (a) that defendant not reside in Broadway Crips' territory[2]; and (b)

---

[2] United States v. LaCoste, 821 F.3d 1187, 1191-92 (9th Cir. 2016) ("Residency restrictions are unquestionably permissible as a general matter.  Congress has authorized district courts to impose conditions requiring that a defendant 'reside in a specified place or area, or refrain from residing in a specified place or area' . . . .

1  that defendant be subject to search by any law enforcement entity of

2  his person, residence, vehicle, or cell phone, with or without

3  reasonable suspicion, at any time.[3]   The government further

4  recommends that defendant be ordered to pay the mandatory special

5  assessment of $100, and that all fines be waived.   The government

6  submits that such a sentence would not be greater than necessary to

7  meet the sentencing goals set forth in 18 U.S.C. § 3553(a).

8  **II.   SENTENCING GUIDELINES**

9      **A.   PSR's Calculations**

10     In the PSR, the USPO submitted the following Sentencing

11 Guidelines calculations:

12 ///

13 ///

14 ///

15

16 ─────────────────────

There are of course situations in which a defendant's ties to his
former community may not be a positive influence, and in such cases a
condition of supervised release barring the defendant's return may
well be justified.   Courts have typically upheld so-called
'banishment' conditions when the defendant's ties to a particular
area contributed to his past criminality, thus increasing the
likelihood that he will re-offend if he returns.") (emphasis added).
See, e.g., United States v. Watson, 582 F.3d 974, 983–85 (9th Cir.
2009); United States v. Sicher, 239 F.3d 289, 291–92 (3d Cir. 2000);
United States v. Cothran, 855 F.2d 749, 752 (11th Cir. 1988).

[3] The Ninth Circuit has recognized the validity of such
conditions even where investigators are not required to have
reasonable cause.   United States v. King, 608 F.3d 1122, 1131 (9th
Cir. 2010) ("the imposition of the search condition was reasonably
related to protecting the public and preventing recidivism") (citing
United States v. Betts, 511 F.3d 872, 876 (9th Cir. 2007)).
Furthermore, under Ninth Circuit law, the terms of defendant's search
condition must explicitly state that it includes his cellphone.   See
United States v. Lara, 815 F.3d 605, 610 (9th Cir. 2016) (Requiring
probation terms to explicitly state that its search terms include
cell phones because "[j]ust as it makes no sense to call a cell phone
a 'container' for purposes of a search incident to arrest (Riley) or
search of an automobile (Camou), it makes no sense to call a cell
phone a 'container' for purposes of a probation search.") (internal
citations omitted).

| GUIDELINES | LEVEL |
|---|---|
| Base Offense Level:<br><br>Conspiracy to Possess Crack Cocaine:<br>[U.S.S.G. § 2D1.1] | 8 |
| **TOTAL OFFENSE LEVEL** | **8** |

(PSR, ¶¶ 20-28.)  The USPO also calculated a criminal history category of III, based on six criminal history points, and a Sentencing Guidelines range of six to 12 months of imprisonment. (Id., ¶¶ 46-47, 106.)  The Probation Office further found that the maximum term of supervised release is one year, the fine range is $2,500 to $10,000 (with a statutory maximum of $250,000), and the mandatory special assessment is $100.  (Id., ¶¶ 108, 112-14.)

Lastly, the PSR noted that because the government filed an information against defendant pursuant to 21 U.S.C. § 851, defendant's (1) mandatory minimum term of imprisonment is 15 days; and (2) statutory maximum term of imprisonment is 24 months.  (See PSR, ¶¶ 3, 105; Dkt. #2684); see also 21 U.S.C. § 844(a).

**B.    Government's Objections to the PSR**

1.    Failure to Include or Reference Trial Exhibits and Testimony

On March 19, 2018 -- over six weeks before the PSR was disclosed -- the government sent the USPO a detailed letter, defendant-specific discovery, and defendant-specific trial exhibits (along with a description of the exhibits, recordings, and transcripts). Unfortunately, for reasons that are unclear, the USPO essentially ignored all of this information by failing to include or reference any of these materials (which included evidence admitted at trial) in

4

the offense conduct section of the PSR.[4]  As a result, the PSR erroneously omits some of defendant's most egregious conduct and the government's most reliable evidence, including documents, video recordings, and trial transcripts evidencing the fact that defendant was an active OG of the Broadway Crips who rented, operated, and managed a drug house located in BGC territory at 122 W. 58th Street (the "58th Street House"), where crack cocaine, other drugs, and firearms were sold to BGC members and drug addicts.  Such omissions cast the PSR in a distorted light, particularly regarding defendant's personal conduct and culpability.  It is of particular import for such facts to be included in the record, and at a minimum, in order to provide the Bureau of Prisons ("BOP") with an accurate assessment of defendant (so that the BOP can use such information to manage its facilities).

Specifically, the omitted evidence and information includes:

(1) Photos, video recordings, and transcripts of trial testimony relating to defendant, the 58th Street House, and the use of the 58th Street House by defendant and other BGC members to conduct gang activities and distribute illegal narcotics, including:

- A photograph of the 58th Street House.  (Exh. 5.)

- Trial testimony from three different cooperating witnesses:

---

[4] The USPO provided its standard notation that it relied on the charging document and "discovery materials" provided by the government, but it is unclear whether it reviewed any of the specifically provided trial exhibits, recordings, or transcripts. (See PSR, ¶ 9.)  Regardless, in the offense conduct section of the PSR, other than one general background paragraph regarding the gang (which has essentially been included in every PSR filed in this case), the PSR includes just four short sentences about defendant's conduct.  (Id., ¶¶ 10-14.)  These sentences simply note that defendant was a member of the gang, that he purchased 63 grams of crack cocaine from other BGC members in February/March 2013, and that he was arrested in 2014.  (Id., ¶¶ 11-14.)

o CW-16 testified that the 58th Street House was known as "Big Toon's house," and that it was "the place where Toon . . . was at the most." (Exh. A, Excerpt from Transcript of CW-16's Trial Testimony.) CW-16 testified that gang meetings, parties, and get-togethers occurred at the 58th Street House. (Id.) CW-16 further testified that he had previously purchased marijuana at the 58th Street House from co-defendant Damon Hogan, who at the time was working for defendant. (Id.)

o CW-15 testified that defendant sold crack cocaine out of drug houses on 58th Street in BGC territory, including the 58th Street House. (Exh. B, Excerpt from Transcript of CW-15's Trial Testimony.) CW-15 also testified that he had previously purchased and sold crack cocaine from/to defendant (for resale purposes) in varying quantities, including ounce quantities, and that some of these transactions occurred at the 58th Street House. (Id.) CW-15 also testified that other BGC members sold crack cocaine for defendant at the 58th Street House, including, among others, co-defendants Damon Hogan and Jermaine Houston. (Id.)

o CW-1 testified that over the years, defendant operated a number of drug houses on 58th Street, including the 58th Street House. (Exh. C, Excerpt from Transcript of CW-1's Trial Testimony.) CW-1 stated that defendant employed other BGC members to sell crack cocaine and marijuana at these drug spots, and that defendant only supplied the drugs and picked up the proceeds (but never sold the drugs himself to users). (Id.) CW-1 also testified that he had been to the 58th Street House to attend gang meetings, and that he knew of other gang meetings that occurred at the house (including a female gang meeting). (Id.)[5]

• Video clips and transcripts of a June 13, 2012, meeting at the 58th Street House between a confidential source (CW-2) and co-defendant Damon Hogan regarding the potential sale of cocaine/crack cocaine and the impending supply of cocaine/crack cocaine to co-defendant Hogan by defendant (Toon). (Exh. D, Excerpts from Transcript of 6/13/12 Meeting.)

---

[5] The government only recently obtained the transcripts of the trial testimony of CW-16 and CW-1 (while preparing for trial against co-defendant Mark Keith). As such, the government did not provide these transcripts to the USPO prior to the filing of defendant's PSR.

- Video clips and transcripts of a <u>June 2, 2012</u>, female gang meeting (called by co-defendant Tracy Harris) that took place at the <u>58th Street House</u>, during which female gang members discussed: co-defendant Harris' complaint that the female gang members were not living up to his standards; the need for female gang members to represent the gang and have each other's "back[s]"; the obligation of female gang members to write to incarcerated BGC members; the obligation of female gang members to be "active" gang members who play some role in the gang, whether it be fighting, robbing, etc.; and the punishment for not following the gang's rules, i.e., physical violence, a "DP" (discipline), or getting "put . . . off the set" (kicked out of the gang). (Exh. E, Excerpts from Transcript of 6/2/12 Female Gang Meeting.)

- Photos and other evidence documenting CW-1's controlled purchase of an M-18 assault rifle from co-defendant Damon Hogan on <u>October 15, 2012</u>, at the <u>58th Street House</u>. (Exh. F, Screen Captures from Video Recording of 10/15/12 Controlled Purchase; Exh. G, Excerpt from Transcript of FBI Special Agent ("SA") Minh Truong's Testimony re 10/15/12 Controlled Purchase.)

- Photos and other evidence documenting CW-1's controlled purchase of 7.8 grams of crack cocaine from co-defendant Jermaine Houston on <u>January 8, 2013</u>, at the <u>58th Street House</u>. (Exh. H, Screen Captures from Video Recording of 1/8/13 Controlled Purchase; Exh. I, Excerpt from Transcript of FBI SA Minh Truong's Testimony re 1/8/13 Controlled Purchase.)

(2) Moving and lease records submitted by defendant during his trial, which purported to show that defendant had cut ties with the 58th Street House in May 2012. Defendant deceptively presented these records to the jury to create the false impression that defendant was no longer associated with the 58th Street House as of May 2012, after which many of the events described immediately above occurred, including the June 2, 2012, female gang meeting, June 13, 2012, meeting between co-defendant Damon Hogan and CW-2 (to discuss purchase of crack cocaine), October 15, 2012, controlled purchase of an assault rifle from co-defendant Hogan, and January 8, 2013,

7

controlled purchase of crack cocaine from co-defendant Jermaine Houston.  However, as discussed in paragraph (3) below, the government, in its rebuttal case, presented lease records for the 58th Street House that completely refuted defendant's claims.

- Uhaul records submitted by defendant.  (Exh. J, Uhaul Records.)

- Lease records submitted by defendant from Pacifica Companies indicating that defendant began renting a house in Lancaster, California on May 1, 2012.  (Exh. K, Pacifica Companies Records.)

(3) Lease records for the 58th Street House (from Capra Realty) establishing that defendant rented the home from February 2009 to July 2013.  (Exh. L, Lease Records for the 58th Street House.)  In addition, a representative from Capra Realty testified that defendant made every rent payment in cash, and that the representative received a number of these cash payments directly from defendant at Capra Realty's office.  (Exh. M, Excerpt from Transcript of Capra Realty Representative's Trial Testimony.)

(4) Trial testimony from LAPD Officer and crack cocaine expert Dennis Jarrott, which established that the quantity of crack cocaine purchased by defendant (in February/March 2013) was a distribution/resale quantity, and not a personal use quantity.[6] (Exh. N, Excerpt from Transcript of Dennis Jarrott's Trial Testimony.)  As noted in the PSR, defendant purchased 56 grams of crack cocaine from co-defendants Tyrine Martinez and Roosevelt Sumpter from February 28, 2013, to March 4, 2013, and another seven grams of crack cocaine on March 16, 2013.  (PSR, ¶¶ 12-13.)  Thus,

---

[6] At trial, defendant's primary defense was that he purchased the crack cocaine for personal use.

defendant purchased 56 grams of crack cocaine over a five-day period (February 28, 2013, to March 4, 2013), and 63 grams of crack cocaine over a 16-day period (February 28, 2013, to March 16, 2013).  As was made clear from Officer Jarrott's testimony, the purchase of this quantity of crack cocaine (over five or 16 days) is <u>consistent</u> with that of a South Los Angeles crack cocaine dealer, and totally <u>inconsistent</u> with that of a typical crack cocaine user. Specifically, Officer Jarrott testified that in the South Los Angeles area, a typical <u>crack cocaine user</u> will buy between <u>two tenths of a gram and one gram</u> of crack cocaine during each purchase.[7]  (Exh. N at 233.)  Conversely, Officer Jarrott testified that a typical South Los Angeles <u>crack cocaine dealer</u> will purchase between <u>14 to 28 grams</u> of crack cocaine a week from his supplier (purchased over the course of a week in three-and-a-half to seven gram increments).[8]  (<u>Id.</u> at 238.)

(5) A trial stipulation between the government and defendant relating to his employment and drug testing history with the City of Los Angeles, Department of Transportation ("DOT").  (Exh. O, Trial Stipulation.)  In the stipulation, defendant admitted that from 1982 to 2014, he was drug tested by the DOT on 13 separate occasions. (<u>Id.</u>)  Despite his claim that he was a crack cocaine addict, defendant never once tested positive for cocaine.[9]  (<u>Id.</u>)

---

[7] Officer Jarrott further testified that a user can take one-to-two "hits" from two tenths of a gram of crack cocaine, and seven-to-10 "hits" from one gram of crack cocaine. (Exh. N at 233.)

[8] Officer Jarrot provided the following estimates regarding the current street level prices for crack cocaine: one gram – $20 to $25; 3.5 grams (eight ball) – $120 to $150; seven grams (quarter ounce) – $250 to $350; 14 grams (half ounce) – $500 to $800; and 28 grams (ounce) – $1,100.  (Exh. N at 237-38.)

[9] Defendant did test positive on one occasion in 2011 for methamphetamine.  (Exh. O.)

1    (6) Recent photographs of (some of) defendant's gang tattoos

2    (Exh. P, Photos of Defendant's Gang Tattoos); photographs of

3    defendant at a May 3, 2014, Broadway Crips "Hood Day" in Las Vegas

4    (Exh. Q, Photos from BGC Hood Day); and a representative sample of

5    text messages from defendant's cell phone (from April 2014 – June

6    2014), between defendant and other BGC members (including gang leader

7    and co-defendant Tracy Harris, aka "Woody"), in which defendant uses

8    gang/BGC slang, discusses when he will next be at the "set" (i.e.,

9    the gang's territory/neighborhood), and is referred to as an "O.G."

10   or by his gang moniker ("Toon"/"Cartoon") (Exh. R, Text Messages).

11   Each of these exhibits corroborate the government's position at trial

12   that defendant was not only a BGC member, but an active one at the

13   time of his arrest in June 2014.[10]

14        2.   Failure to Apply U.S.S.G. § 2D1.1 (the Drug
               Trafficking Guideline)
15

16        a.   The Court should apply the drug trafficking
               Guideline to defendant's drug trafficking conduct

17        As discussed above, the evidence presented at trial established

18   that defendant was a prolific crack cocaine trafficker who operated

19   drug houses in Broadway Crips territory.  In particular, the evidence

20   showed that defendant was responsible for securing, maintaining, and

21   managing the 58th Street House, which he leased and paid rent on from

22   2009 to 2013 (despite having another residence outside of the gang's

23   territory).  (See Exh. L at 4-7.)  Unlike many of his co-conspirators

24   who sold drugs directly to users, defendant insulated himself from

25   law enforcement detection by employing others, including co-

26

27   ────────────

28        [10] At trial, defendant's counsel argued that defendant had long
     ago moved away from BGC territory and was no longer an active gang
     member.

                                   10

defendants Damon Hogan and Jermaine Houston, to sell crack cocaine on his behalf and/or from the 58th Street House.  Indeed, it was only through a federal wiretap that the FBI learned of defendant's involvement in the BGC drug trafficking conspiracy, which uncovered several calls between defendant and the gang's crack cocaine wholesalers, co-defendants Tyrine Martinez and Roosevelt Sumpter. And on those calls, the FBI listened to defendant purchase significant quantities of crack cocaine in a very short period of time, which plainly evidenced his intent to redistribute the drugs (likely via the 58th Street House).

Despite this clear and convincing evidence of defendant's drug trafficking, the USPO declined to apply the drug trafficking Guideline (U.S.S.G. § 2D1.1), and instead (without any explanation) only applied the drug possession Guideline (U.S.S.G. § 2D2.1).  The government suspects that the Probation Office did so because defendant was only convicted for conspiring to possess crack cocaine. However, this was error and fails to hold the defendant accountable for both his own conduct and the conduct of his co-conspirators that was reasonably foreseeable to him.

Through its relevant conduct provisions, the Sentencing Guidelines specifically provide for the inclusion of conduct that is not explicitly a part of the count of conviction.  See U.S.S.G. § 1B1.3.  Section 1B1.3 states that relevant conduct includes:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise, undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were --

        (i) within the scope of the jointly undertaken
        criminal activity,

        (ii) in furtherance of that criminal activity, and

        (iii) reasonably foreseeable in connection with that
        criminal activity;

    that occurred during the commission of the offense of
    conviction, [or] in preparation for that offense . . . .

U.S.S.G. § 1B1.3(a)(1).  Moreover, Application Note 1 of

Section 1B1.3 makes clear that the application of the Guidelines is

not circumscribed by the offense of conviction:

        The principles and limits of sentencing accountability
        under this guideline are not always the same as the
        principles and limits of criminal liability.  Under
        subsections (a)(1) and (a)(2), the focus is on the specific
        acts and omissions for which the defendant is to be held
        accountable in determining the applicable guideline range,
        rather than on whether the defendant is criminally liable
        for an offense as a principal, accomplice, or conspirator.

Id., n.1.  Thus, in defendant's case, even though he was only

convicted for conspiring to possess crack cocaine, the Court can hold

defendant liable for conspiring to distribute crack cocaine under

U.S.S.G. §§ 1B1.3 (relevant conduct Guideline) and 2D1.1 (drug

trafficking Guideline) in light of the substantial evidence of drug

trafficking that was presented at trial.

    Nor do defendant's acquittals on counts one (RICO conspiracy)

and 11 (drug trafficking conspiracy) bar the Court's consideration of

defendant's gang and drug trafficking conduct for purposes of the

Sentencing Guidelines.  Supreme Court precedent and statutory history

make clear that a sentencing court must consider not just the crime

of conviction, but the full landscape, both positive and negative,

when sentencing a defendant (provided that landscape is supported by

reliable evidence).  United States v. Rivera, 527 F.3d 891, 911 (9th

Cir. 2008) (explaining that a sentence must be based on an individualized determination based on all the facts); Pepper v. United States, 131 S. Ct. 1229, 1240 (2011) ("[T]he punishment should fit the offender and not merely the crime.") (emphasis added).  The sentencing statute is unequivocal: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  "Highly relevant -- if not essential -- to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."  Williams v. New York, 337 U.S. 241, 247 (1949).  "A sentencing judge may even consider past criminal behavior which did not result in a conviction . . . ."  BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 573 n.19 (1996).

Accordingly, "a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant has been acquitted."  United States v. Donelson, 695 F.2d 583, 590 (1982) (emphasis added) (citations omitted); United States v. Morgan, 595 F.2d 1134, 1135-37 (9th Cir. 1979) (holding there was "no merit" to claim that consideration of acquitted conduct at sentencing amounted to a double jeopardy violation).  Importantly, this is because "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt" as to some unknown element of the crime.  United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984) (emphasis added).  As such, "an acquittal in a criminal case does not preclude the Government from relitigating an issue when

13

1    it is presented in a subsequent action governed by a lower standard

2    of proof." Dowling v. United States, 493 U.S. 342, 349 (1990); see

3    also United States v. White, 519 U.S. 148, 156 (1997); United States

4    v. White, 621 F. App'x 889, 893 (9th Cir. 2015) (citing United States

5    v. Mercado, 474 F.3d 654, 657-58 (9th Cir. 2007)).

6                    b.   Drug quantity under U.S.S.G. § 2D1.1

7            In determining the appropriate drug quantity under U.S.S.G.

8    § 2D1.1, it is important to recognize that defendant's drug

9    trafficking conduct fell within the broader framework of his drug

10   dealing as part of a joint undertaking by him and his fellow gang

11   members.  This is particularly true given that defendant operated a

12   drug house in Broadway Crips territory, which benefited from the

13   gang's protection, counter-surveillance against law enforcement and

14   rivals, and perhaps most importantly, it's monopoly on crack cocaine

15   sales within the territory.  As a result, the Court can and should

16   take into account the drugs sold as part of the larger BGC drug

17   trafficking conspiracy when sentencing defendant.

18           Put another way, since there is clear and convincing evidence

19   that defendant participated in criminal conduct with others as part

20   of a criminal conspiracy/enterprise, all reasonably foreseeable

21   criminal conduct committed within the scope of and in furtherance of

22   that conspiracy/enterprise can be included in defendant's offense

23   conduct.  United States v. Reed, 575 F.3d 900, 925 (9th Cir. 2009)

24   ("a conspirator is to be judged on the quantity of drugs that he

25   reasonably foresaw or which fell within the scope of his particular

26   agreement with the conspirator"); United States v. Banuelos, 322 F.3d

27   700, 702 (9th Cir. 2003) ("requir[ing]" the district court to make

28   this determination) (emphasis added).

1    The scenario here -- where a criminal enterprise controls a

2  well-defined geographic drug-selling monopoly -- is analogous to the

3  one discussed by the First Circuit in United States v. Rodriguez, 525

4  F.3d 85 (1st Cir. 2008), where the court determined defendants'

5  liability for a certain drug quantity based on their involvement in a

6  drug trafficking conspiracy operating in a housing project:

> the evidence established that <u>the sub-conspiracies indeed
> functioned as a part of the grander drug scheme</u> at [the
> project].  Ample evidence established that the Covadonga <u>housing
> project functioned as a busy narcotics bazaar</u> in which the
> owners of different "brands" of cocaine, crack, heroin, and
> marijuana cooperated to sell their distinctly labeled products.
> <u>The success of each owner's drug operation depended on the
> overall security of Covadonga</u>, and look-outs employed by
> different drug owners acted for the Covadonga marketplace's
> benefit as a whole.

13  Id. at 102-03 (emphasis added).

14    Furthermore, when determining the quantity of drugs attributable

15  to a conspiracy "[w]here the amount of drugs seized does not reflect

16  the scale of the offense, the district court may approximate the

17  quantity of the drug."  United States v. Culps, 300 F.3d 1069, 1076

18  (9th Cir. 2002).  Likewise, and as discussed above, even though the

19  offense of conviction was conspiracy to possess crack cocaine and not

20  conspiracy to distribute crack cocaine, the full extent of

21  defendant's criminal responsibility is measured by his jointly

22  undertaken criminal activities.  The Court must determine the scope

23  of the criminal activity that defendant agreed to participate in and

24  "may consider any explicit agreement or implicit agreement fairly

25  inferred from the conduct of the defendant and others."  U.S.S.G.

26  § 1B1.3, n. 3(B).  Here, for the reasons discussed below and under a

27  clear and convincing evidence standard, the government submits that a

28  conservative estimate of the quantity involved in defendant's

1 agreement to distribute crack cocaine in concert with the Broadway
2 Crips (and which was reasonably foreseeable to him) is at least 2.8
3 kilograms of crack cocaine.

4     The evidence at trial established defendant's decades-long
5 history with the Broadway Crips, his active membership in the gang,
6 and his involvement in its drug trafficking activities since as far
7 back as 1999.  Defendant's long and intimate involvement in the
8 gang's drug distribution was evidenced not only by the wiretap calls
9 in which he purchased distribution quantities of crack cocaine from
10 co-defendants Tyrine Martinez and Roosevelt Sumpter, but by his
11 dealings with other BGC members; his reputation as being a drug house
12 operator on 58th Street; and his prior arrests and convictions for
13 drug trafficking.

14     Each of the government's three cooperating witnesses who
15 participated in defendant's trial testified about defendant's
16 operation of drug houses on 58th Street.  Initially, CW-16 testified
17 that he had previously purchased marijuana at the 58th Street House
18 from one of defendant's employees, co-defendant Damon Hogan.  (Exh. A
19 at 120-21.)  Next, CW-1 testified that as far back as the "2000s,"
20 defendant operated drug houses in the gang's territory where
21 marijuana and crack cocaine were sold, i.e., the 58th Street House
22 and a prior drug house on 58th Street ("Prior 58th Street House").
23 (Exh. C at 99-101 (emphasis added).)  CW-1 testified that his former
24 wife, CW-2[11], and another BGC member, "Baby Toon," both told CW-1 that
25 defendant had "set them up in a drug house" on 58th Street where they
26 sold "weed" and "crack" for the defendant.  (Id.)  They further told

27 _____

28     [11] CW-2 testified in co-defendant Tony Gordon's trial, but
declined to testify during defendant's trial due to safety concerns.

16

1  CW-1 that defendant provided them with the drugs to sell, would

2  "never sell himself," and would later come back to the drug house to

3  resupply them and "get his money." (Id.) "Baby Toon" also told CW-1

4  that he viewed defendant "like . . . his father," and that defendant

5  taught him "everything" he knew "in terms of drug dealing." (Id. at

6  99.)

7  　　Similarly, CW-15 testified that as far back as 1999, defendant

8  sold crack cocaine initially out of the Prior 58th Street House, and

9  later from the 58th Street House. (Exh. B at 27-30.) CW-15 also

10  testified that from 1999-2000, he himself operated a drug house next

11  door to the Prior 58th Street House, and that during that time, he

12  observed CW-2 (CW-1's former wife) and "Baby Cartoon," among others,

13  selling crack cocaine for defendant and/or out of the Prior 58th

14  Street House. (Id. at 28-32.) CW-15 testified that at the time, his

15  drug house sold "at least" "a couple ounces" of crack cocaine every

16  day.[12] (Id. at 32.) With respect to the 58th Street House, CW-15

17  testified that co-defendants Damon Hogan, Jermaine Houston, Derrek

18  Jones (referred to as "Dirty D"), and others sold crack cocaine for

19  and/or with defendant out of the house. (Id. at 34-35.)

20  　　CW-15 also testified that he had personally bought and sold

21  crack cocaine from/to defendant (in redistribution quantities) on

22  approximately 10 occasions. (Exh. B at 32-33.) First, when CW-15

23  was 15-16 years old (in the 1990s), he purchased between three-and-a-

24  half to seven grams of crack cocaine from defendant on approximately

25  six occasions (total of between 21 and 42 grams). (Id.) Second, a

26

27  ─────────────

28  　　[12] CW-15 testified that he believed that his drug house sold more
crack cocaine on a daily basis than the Prior 58th Street House.
(Exh. B. at 32.)

17

few years later, CW-15 purchased an ounce of crack cocaine on two separate occasions (total of two ounces) from defendant at the Prior 58th Street House.  (Id. at 33.)  Third, in approximately 2002, CW-15 sold defendant an ounce of crack cocaine on two separate occasions (total of two ounces) at the 58th Street House.  (Id. at 33-34.)

In addition to the above cooperator testimony, the government notes that defendant has two prior convictions that demonstrate his status as a long-time drug trafficker.  In 1984, defendant was convicted of maintaining a premises (in BGC territory) to sell controlled substances (Cal. Health & Safety Code § 11366), based on his possession of 19.4 grams of crack cocaine, 2.2 grams of marijuana, and drug dealing paraphernalia.  (PSR, ¶ 35.)  In 1988, defendant was arrested for possessing and distributing marijuana, although he ultimately plead to possession of a controlled substance. (Id., ¶¶ 40-41.)

In sum, the evidence, testimony, and criminal history described above all point to the conclusion that defendant is personally responsible for trafficking significant quantities of crack cocaine, well beyond the government's suggested quantity of 2.8 kilograms. The trial evidence demonstrated that defendant sold crack cocaine through his 58th Street drug houses for at least 14 years (from 1999 to 2013), and likely, much longer.  Even if the Court were to conservatively estimate that defendant sold an ounce of crack cocaine a week through his drug houses on 58th Street, it would only have

taken defendant 100 weeks (<u>less than two years</u>) to sell 2.8 kilograms

of crack cocaine.[13]

Furthermore, given his role as a drug house operator in gang

territory, it was obviously foreseeable to him that the gang's

jointly undertaken main source of income, crack cocaine sales, ran

into the thousands of grams of crack cocaine.  The evidence at trial

gave the barest outline of the volume of crack cocaine that the

Broadway Crips distributed.  And even the small fraction of the

gang's crack cocaine trafficking that the FBI was able to purchase

through controlled buys or seize through searches amounted to over a

kilogram during just a few years of investigation.  (<u>See</u> Exh. T,

Chart of Crack Cocaine Purchases/Seizures.)  Additionally, testimony

at trial established that a conservative estimate of the amount of

crack cocaine involved in transactions occurring over the monitored

wiretaps on the phones of co-defendants Tyrine Martinez and Roosevelt

Sumpter during a mere two-month period totaled nearly 1.8 kilograms

of crack cocaine.  (<u>See</u> Exhibit U, Chart of Crack Cocaine Quantities

Discussed on Wiretaps.)  Thus, clear and convincing evidence shows

that, considering defendant's decades-long involvement in the gang's

crack cocaine distribution, a conservative estimate of the quantity

of crack cocaine that forms a part of his relevant conduct is easily

---

[13] The government submits that an ounce-a-week estimate would be extremely conservative, given that: (1) CW-15 testified that he sold a <u>few ounces a day</u> out of his drug house on 58th Street, which was next door to the Prior 58th Street House (Exh. B at 32); (2) defendant was heard on the federal wiretap purchasing 2 ounces (56 grams) of crack cocaine over a five-day period and 63 grams of crack cocaine over a 16-day period (PSR, ¶¶ 12-13); (3) defendant bought and sold ounce quantities of crack cocaine from CW-15 on multiple occasions (Exh. B at 33-34); and (4) CW-16 testified that he sold approximately half-an-ounce to an ounce-and-a-half daily out of his drug house on 48th Street (Exh. S, Excerpt from Transcript of CW-16's Trial Testimony).

2.8 kilograms.  At this quantity, defendant's base offense level under U.S.S.G. § 2D1.1(c)(3) would be 34.

In the alternative, and at a minimum, the government urges the Court to hold defendant responsible under U.S.S.G. § 2D1.1 for the 63 grams of crack cocaine that he purchased for resale purposes from co-defendants Tyrine Martinez and Roosevelt Sumpter in February/March 2013.  (See PSR, ¶¶ 12-13.)  At this lower quantity, defendant's base offense level under U.S.S.G. § 2D1.1(c)(8) would be 24.[14]

c.  <u>Two-Level enhancement for maintaining a drug premises under U.S.S.G. § 2D1.1(b)(12)</u>

Under U.S.S.G. § 2D1.1, a two-level enhancement applies "[i]f the defendant maintained a premises for the purpose of . . . distributing a controlled substance."  U.S.S.G. § 2D1.1(b)(12).  As discussed above, the trial evidence established that defendant maintained and paid rent on the 58th Street House, which was used as a drug spot from which defendant and his employees distributed crack cocaine and marijuana.  As such, this two level enhancement clearly applies.

---

[14] The government notes that even if the Court were not inclined to apply the drug trafficking Guideline (U.S.S.G. § 2D1.1), and instead only applied the drug possession Guideline (U.S.S.G. § 2D2.1), the Court could still hold defendant accountable for his drug trafficking conduct.  Application Note 1 of Section 2D2.1 specifically provides for such a situation: "The typical case addressed by this guideline involves possession of a controlled substance by the defendant for the defendant's own consumption. Where the circumstances establish intended consumption by a person other than the defendant, an upward departure may be warranted." U.S.S.G. § 2D2.1, n.1.  Here, in light of the substantial evidence presented at trial establishing that defendant purchased 63 grams of crack cocaine (on the wiretap calls) for purposes of resale, a substantial upward departure is warranted.  Given that the statutory maximum for defendant's offense of conviction is 24 months, and with defendant's criminal history category of III, even a five-level upward departure would result in a Guidelines range (18-24 months) that would be inclusive of the statutory maximum sentence.

20

C.    **Government's Recommended Sentencing Guidelines Range**

With the exception of the above-noted objections, the government concurs with the balance of the PSR's calculations, including of the defendant's criminal history category as III.  With a total offense level of 36 (base offense level under U.S.S.G. § 2D1.1(c)(3) of 34 plus two-level enhancement for maintaining a drug premises), defendant's Guidelines range is 235 to 293 months of imprisonment. Alternatively, if the Court is inclined to find the lower drug quantity discussed above (63 grams), defendant's total offense level is 26 (base offense level under U.S.S.G. § 2D1.1(c)(8) of 24 plus two-level enhancement for maintaining a drug premises) and Guidelines range is 78 to 97 months of imprisonment.[15]

**III. STATUTORY MINIMUM AND MAXIMUM SENTENCES**

Where a defendant has a prior conviction for a drug offense, the applicable mandatory minimum sentence for conspiring to possess crack cocaine, in violation of 21 U.S.C. §§ 844, 846, is 15 days of imprisonment, while the statutory maximum is 24 months of imprisonment and one year of supervised release.  (PSR, ¶¶ 105, 108); 21 U.S.C. § 844.  On September 19, 2017, the government filed an information against defendant pursuant to 21 U.S.C. § 851.  As of the date of this filing, defendant has not challenged or denied any allegation contained in the information.  If the defendant does file a written challenge to the information, the government requests leave to be afforded sufficient time to respond to defendant's challenge.

---

[15] The government notes that both of the proposed Guidelines ranges are well above the applicable 24-month statutory maximum.

IV.   **GOVERNMENT'S RECOMMENDATION**

The government respectfully recommends that the Court sentence defendant to 24 months of imprisonment, one year of supervised release, and a special assessment of $100.  In light of defendant's continuous and lengthy history of drug house operation and gang membership, the government submits that such a sentence would not be greater than necessary to meet the sentencing goals set forth in 18 U.S.C. § 3553(a).  Indeed, from the government's perspective, given the significantly higher Guidelines range, a 24-month sentence would, in many ways, represent an unfortunate windfall for the defendant.

A.   **The 3553(a) Factors Compel a 24-Month Sentence to Reflect Defendant's Decades-Long History of Crack Cocaine Trafficking With the Broadway Crips**

The trial evidence established that defendant has been a longtime member and OG of the BGC, a violent and pernicious criminal enterprise that has, for decades, harmed and terrorized the community that it has claimed as its territory.  And it is in this South Los Angeles community that defendant has done the most harm, operating drug houses on 58th Street from which crack cocaine was distributed for many years to a clientele consisting primarily of drug addicts, the mentally ill, and other desperate individuals hungry for the cheap but devastating "fix" that crack cocaine offers.  It is individuals like defendant who keep the lucrative crack cocaine business booming, and the resulting violence constant. Unsurprisingly, the government notes that while defendant felt free to profit from the daily distribution of crack cocaine in this community, he did not see the gang's territory as a fit place to maintain his family residence.

In addition, the consistency and longevity of defendant's crack cocaine operation is particularly noteworthy, and arguably rivals that of any other BGC member charged in this 72-defendant indictment. As discussed above, the evidence established that defendant operated his drug houses going back to 1999, and in all likelihood, much longer given that he has sustained drug trafficking convictions as far back as 1984.  As such, over these past few decades, defendant has been personally responsible for distributing enormous amounts of crack cocaine in the gang's territory, and must be held accountable for his destructive actions.  Given that the Guidelines range for defendant's conduct far exceeds the 24-month statutory maximum, the government submits that its recommended sentence is more than justified.

Defendant's criminal history also bears mentioning, as his prior state sentences have completely failed to deter him from continuing his criminal lifestyle.  In addition to the two drug convictions previously mentioned, defendant has been convicted for theft, convicted person in possession of a firearm, willful child cruelty, bringing alcohol/drugs into a prison, and driving under the influence.  (PSR, ¶¶ 32-44.)  Defendant also has arrests for burglary, robbery, attempted murder, resisting arrest, theft, and battery on a spouse (four separate occasions).  (Id., ¶¶ 48-55, 57-68.)  As a result of his convictions, defendant has received several custodial sentences, including a two-year prison sentence, all of which have been ineffective at deterring defendant.  As such, the government submits that deterrence is also a significant factor that weighs in favor of the government's recommended sentence.

1    Finally, the government would ask the Court to also consider the

2    defendant's brazen attempts to mislead this Court, the jury, the

3    Probation Office, and the government as an aggravating factor at his

4    sentencing.  At his trial, and as discussed above, defendant

5    presented evidence and testimony that purported to show that he had

6    completely cut ties with the 58th Street House, in an effort to

7    distance himself from the substantial evidence presented by the

8    government that conclusively linked the house to gang activity (gang

9    meetings), drug trafficking, and firearms trafficking.  However, in

10   response to defendant's false claims, the government uncovered

11   evidence which showed that defendant was paying rent on the 58th

12   Street House: (1) after the date on which he claimed to have cut ties

13   with the house; and (2) during a time when crack cocaine sales,

14   firearms sales, and gang meetings were taking place at the house.

15   Despite the fact that his attempts to deceive the jury were

16   revealed, defendant appears to have doubled down on his prior claims

17   through his representations to the U.S.P.O.  In an apparent attempt

18   to obtain credit for acceptance of responsibility, the PSR reports

19   that defendant continues to assert the claim that the 63 grams of

20   crack cocaine he purchased (over the wiretap) were for personal use.

21   (PSR, ¶ 17.)  In further support of his acceptance of responsibility

22   argument, defendant also points to a pre-trial CASA application that

23   he submitted, in which he claimed to be a crack cocaine addict (but

24   failed to actually admit that he purchased the 63 grams of crack

25   cocaine).[16]  (Id.)  But defendant's CASA Application, rather than help

26

27        [16] Tellingly, despite his claim that he has been a crack cocaine
     user since the age of 19, who sometimes would uncontrollably binge on
28   the drug every six months to a year, defendant reports that he does

                                   24

1  his case, only serves to further highlight the fact that defendant

2  has been lying about his culpability in this case since day one.  In

3  fact, as the PSR points out, defendant claimed in his application

4  that "his presence" at the 58th Street House was "not related to the

5  distribution of narcotics, or any of the other serious crimes with

6  which his co-defendants [were] charged." (Id.)  Defendant even went

7  so far as to deny his membership in the Broadway Crips.  (Id.)  In

8  light of the overwhelming evidence presented at trial that

9  demonstrated defendant's decades-long involvement in the BGC's

10  racketeering and drug trafficking activities, the Court should, like

11  the Probation Office, reject defendant's attempt to obtain credit for

12  acceptance of responsibility, and should also consider defendant's

13  continued deception as a factor in aggravation.

14  **V.   CONCLUSION**

15      For the foregoing reasons, the government respectfully

16  recommends that the Court sentence defendant to:

17      • 24 months of imprisonment;

18      • one year of supervised release, with the two special

19        conditions:

20          o gang territory residence restriction;

21          o search condition;

22      • mandatory special assessment of $100; and

23      • all fines waived.

24

25

26

27  ──────────────────
    "not . . . require[] drug treatment." (PSR, ¶¶ 90-91, 94.)  Given
    defendant's 10-year history of negative cocaine tests with his
28  employer (the DOT), the government submits that defendant's self-
    serving statements are not to be believed. (See Exh. O.)

25

# EXHIBIT 5



Exhibit 5

# EXHIBIT D

CHS:     [Enters another room in the house] What the hell is going on in the hood? What the fuck is going on in the 50?

HOGAN:     What's up [U/I]?

CHS:     What's going on man, what's wrong? Where is Little at?

HOGAN:     [U/I]

CHS:     Little Rave, where is Little Rave at? I mean he's been missing in action for two days. [Television playing in the background] It's been dry.

HOGAN:     [U/I]

CHS:     It's been dry as fuck.

HOGAN:     I was finna say I-I came yesterday for about an hour, for about ten minutes and then I left. I been missing for two days. I was finna go over there right now. I just got out the shower, gotta get my hair done, and I'm finna go over there.

CHS:     [Television playing in the background] It's dry as hell man. When he gone have the meeting with the umm, [U/I] you don't talk to him?

HOGAN:     I don't know. I didn't even know that.

CHS:     It's dry, ain't no work, no weed.

HOGAN:     [U/I] [Television in the background]

CHS:     No shit. Ya'll ain't got no [U/I]

HOGAN:     [U/I] I got the [U/I] and he got the dope.  [Television in the background]

CHS:     Oh he do?

HOGAN:     Oh Rave, Rave?, Little Rave, ain't over there hookin' you?

CHS:     [U/I]

CHS:     [Television plays in the background 8:54-9:00]

CHS:     That's crazy.

HOGAN:     Yea it got to be dry, if yo [U/I]. It's something.

CHS:     Oh you be having some... Ay! And, um, Toon be giving you the good shit too, huh?

HOGAN;     [U/I]

CHS:     So like how much a pound? Like how much a pound?

HOGAN:        That's cool though, That's making me money. I think, I think he makes everything too. He started making his own shit.

CHS:    Oh.

HOGAN:        Getting all this money.

CHS:    Dang. [U/I] Ay, can you um, see how much to give Toon for the pound.

HOGAN:        Oh, alright, uh

CHS:    Because the white is making a nigga go broke, and I gotta pay rent and shit.

CHS:    [U/I]

CHS:    Ya'll don't got the white too? No, ya'll don't. You got some white right now?

HOGAN:        No, I sold out too [U/I]

CHS:    So, Lou ya'll need to…

HOGAN:        I think this shit like two…

CHS:    hundred or some [U/I]

HOGAN:        Yea.

CHS:    Damn.

HOGAN;        Then ya'll make like one-fifty.

CHS:    Yea.

CHS:    Alright, tell me about the…either the greenery or the white.

HOGAN:    Alright, uh.

HOGAN:    Seven.

CHS:    Okay, y'all fucking with Big Lee so…

HOGAN:    Seventy-five…

CHS:    How much Big Lee selling his pound, I mean his quarters for?

HOGAN:    You talking about the weed? We get the weed from this other person.

CHS:    But ya'll getting the white from Lee right?

HOGAN:    Mm hmm, I don't know. I just know buy two, and the seven, so seven, seven, seven. How ever many times it go to uh, uh, a half and a ounce, I don't know. How many sevens is in a half?

CHS:    That's what I'm saying so how much is the sevens?

HOGAN:    Mmm, two hundred [U/I]

CHS:    Two hundred? Oh, okay okay. So its ounce gone be eight hundred.

HOGAN:    Anybody else I heard is like one seventy five or one fifty.

CHS:    But they ain't got none. Who got some? Shit. It's dry.

HOGAN:    What about uh, Shitty?

CHS:    Aw, Shitty.

HOGAN:    He do. You know his shit be alright. If I had my money, I'd go grab that until Toon came. Just to have something to be doing something. I just ain't doing shit, cause I still gotta grab my money.

CHS:    So Toon be here Friday?

HOGAN:    This shit slow. Yup.

CHS:    That's one more day.

HOGAN:    One more day.

# EXHIBIT F



Exhibit 173



Exhibit 174



Exhibit 175



Case Number:

Date of Buy: 10/15/2012
SUBS: EVAN FREEMAN
and DAMON HOGAN
Location: 122 W 58th St
Price: $240.00

Exhibit 176

# EXHIBIT G

1   Q    And this photo is kind of the banner on the Facebook page?

2   A    Yes, sir.

3   Q    What do you take that to mean?

4   A    He very proud of being arrested.

5   Q    Taking a quick step back to the Las Vegas Hood Day and the

6   pictures we displayed, did you take those photos discreetly?

7   Were they covertly taken?

8   A    Are you talking about the Hood Day in Las Vegas?

9   Q    Yes.

10  A    Yes, sir.

11  Q    How were they taken?

12  A    We -- we a few hundred yard away, I forgot the exact

13  distance, that we actually have a long-lens camera set up on a

14  bag.  And myself and Agent Schadt set up a picnic -- kind of

15  picnic blanket in the middle of the park, and we just sat there

16  eat food and taking photo.

17  Q    Now, back to Damon Hogan, other than the Facebook

18  investigation that you just described, did you also conduct

19  another investigation into Damon Hogan?

20  A    Yes, sir.

21  Q    And when did that occur?

22  A    I believe that occurred on October 15 of 2012.

23  Q    And could you generally describe that investigation?

24  A    We bought an assault rifle from Mr. Hogan, sir.

25  Q    And how did that purchase take place?

1   A   We used a confidential human source, met with the source,

2   wired him up with audio/video recording, gave him some money,

3   sent him to Mr. Hogan.  At the time he were at 122 West 58th

4   Street.  Source went over there, purchased the gun.

5       Do you want me to describe what I have seen the video or

6   just overall?

7   Q   We will get to that, but just generally.

8   A   Went over there, met with Mr. Hogan, and came back with an

9   assault rifle.

10  Q   And you mentioned 122 West 58th Street.  Again, did the

11  task force associate that house with a particular individual?

12  A   Mr. Anthony Ingram.

13  Q   Now, did -- you mentioned a source.  What was the code

14  name for this particular source?

15  A   That one were ███████.

16  Q   And after the source -- well, while the source went to --

17  was going to 122 West 58th Street, what were you doing?

18  A   Same thing, set up in the surrounding area, not too close

19  to be spotted but close enough that we can come in and rescue

20  our source if need to.

21  Q   And did the source ultimately return from 122 West 58th

22  Street?

23  A   Yes, sir.

24  Q   And what happened next?

25  A   We recovered an assault rifle in his vehicle.

```
1    Q      And did the source provide the assault rifle to the FBI?

2    A      He didn't touch it.  We took it out of the car, yes.

3    Q      And please take a look at Exhibit 176.

4           (Exhibit 176 for identification.)

5                THE WITNESS:  Yes, sir.

6    BY MR. PARK:

7    Q      Do you recognize it?

8    A      Yes, sir.

9    Q      What is it?

10   A      That's the rifle we bought from Mr. Hogan.   It's an M18.

11               MR. PARK:  Move to admit, Your Honor.

12               MR. EISNER:  No objection.

13               THE COURT:  176 is received.

14          (Exhibit 176 received into evidence.)

15   BY MR. PARK:

16   Q      Now, based on your experience and training as an FBI

17   agent, are you familiar with this type of rifle?

18   A      Yes, sir.   It's military type of a weapon, either 5, 223,

19   or 765 caliber.

20   Q      Is that military-caliber ammunition?

21   A      Typically being used by military or law enforcement.

22   Q      So is this a high-powered rifle?

23   A      Yes, sir.

24   Q      Now, did the FBI retrieve the recording device from the

25   source █████?
```

**UNITED STATES DISTRICT COURT**

1    A     Yes, sir, we did.

2    Q     And have you reviewed the recording of that controlled

3    purchase?

4    A     Yes, sir, I did.

5    Q     And can you generally describe what you saw and heard on

6    that recording?

7    A     The source went over to 122 West 58th Street.  There were

8    a couple people there.  The source could be heard asking for

9    Lou, which was Mr. Damon Hogan.

10           MR. RAYNOR:  I'm sorry, Your Honor.  I couldn't hear

11   the witness.

12   BY MR. PARK:

13   Q     If you could speak up.

14           THE COURT:  Speak into the mic, please.

15           THE WITNESS:  The source come up and ask for Lou,

16   that's Mr. Damon Hogan.  He eventually got inside the house,

17   met with Mr. Hogan, then they both went to the back of the

18   residence.  I could see Mr. Hogan flip up a couch in the

19   backyard area, flip up the couch, and underneath the couch he

20   reach inside and pull out this rifle right here.

21   BY MR. PARK:

22   Q     And what happened next?

23   A     He laid that on the ground.  The two discussion about the

24   type of weapon, the caliber.  Then Mr. -- then the source make

25   a phone call.  I believe he make a phone call through Mr. Evan

1    Freeman and told Mr. Evan Freeman that he want the gun and he

2    would pay 250 for it, 250 for it.  Then he said he would leave

3    the money with Lou, Mr. Damon Hogan.

4    Q    What happened after that?

5    A    Then the source told Mr. Hogan that he would bring the car

6    around, and then he left.  The source can be seen walking away

7    from the residence, get into his vehicle and drive up to the

8    front of the residence.  That's when I could hear a very brief

9    noise, look like Mr. -- appear Mr. Hogan drop the gun in the

10   car for the source, and the source drove away.

11   Q    Please take a look at Exhibits 172 to 175.

12        (Exhibits 172 to 175 for identification.)

13            THE WITNESS:  Yes, sir.

14   BY MR. PARK:

15   Q    Do you recognize them?

16   A    Yes, sir.

17   Q    What are they?

18   A    They were the still image from the actual recording.

19   Q    Each of them is a still image from the recording?

20   A    Yes, sir.

21            MR. PARK:  Your Honor, the Government moves to admit

22   Exhibits 172 to 175.

23            MR. RAYNOR:  No objection.

24            THE COURT:  No observation, Exhibit 172, -3 and -4

25   and -5 are received.

```
 1   BY MR. PARK:
 2   Q    Displaying Exhibit 172, Agent Truong.  What are we seeing
 3   there?
 4   A    That's the front of 122 West 58th Street, sir.
 5   Q    Displaying 173, Agent Truong.  What are we seeing there?
 6   A    That's Mr. Hogan flipping up the couch.
 7   Q    And based on your review of the recording, what was
 8   underneath the couch?
 9   A    The assault rifle.
10   Q    Displaying 174.  What do you see there?
11   A    See the bottom right of the photo, that's a rifle right
12   there on top of the white towel.
13   Q    Displaying Exhibit 175.  What do you see there?
14   A    That's Mr. Damon Hogan.
15   Q    Now, in January of 2013, were you involved in another task
16   force operation involving Anthony Ingram's house at 122 West
17   58th Street?
18   A    Yes, sir.
19   Q    Could you generally describe that operation.
20   A    We using, again, a confidential human source, wire him up
21   with the audio/video recording, give him some money, went over
22   to that location and bought crack cocaine.
23   Q    And was the specific date that this operation occurred on
24   January 8th, 2000 --
25   A    January 8.
```

# EXHIBIT H



Exhibit 178



Exhibit 179

# EXHIBIT I

```
1    BY MR. PARK:

2    Q    Displaying Exhibit 172, Agent Truong.  What are we seeing

3    there?

4    A    That's the front of 122 West 58th Street, sir.

5    Q    Displaying 173, Agent Truong.  What are we seeing there?

6    A    That's Mr. Hogan flipping up the couch.

7    Q    And based on your review of the recording, what was

8    underneath the couch?

9    A    The assault rifle.

10   Q    Displaying 174.  What do you see there?

11   A    See the bottom right of the photo, that's a rifle right

12   there on top of the white towel.

13   Q    Displaying Exhibit 175.  What do you see there?

14   A    That's Mr. Damon Hogan.

15   Q    Now, in January of 2013, were you involved in another task

16   force operation involving Anthony Ingram's house at 122 West

17   58th Street?

18   A    Yes, sir.

19   Q    Could you generally describe that operation.

20   A    We using, again, a confidential human source, wire him up

21   with the audio/video recording, give him some money, went over

22   to that location and bought crack cocaine.

23   Q    And was the specific date that this operation occurred on

24   January 8th, 2000 --

25   A    January 8.
```

1    Q    2013?

2    A    2013.

3    Q    And who was the purchase of crack cocaine supposed to be

4    from?

5    A    From Broadway Crip member Jermaine Houston.

6    Q    Does he have a gang moniker?

7    A    J-Bone.

8    Q    Does he have a particular status within the gang?

9    A    He's one of the veterans gang member.

10   Q    Take a look at Exhibit 51.19.

11        (Exhibit 51.19 for identification.)

12             THE WITNESS:  Yes, sir.

13        .19, correct?

14   BY MR. PARK:

15   Q    Yes, 51.19.

16   A    That's Mr. Jermaine Houston, sir, J-Bone.

17             MR. PARK:  Your Honor, the Government moves to admit

18   Exhibit 51.19.

19             THE COURT:  51.19 is received hearing no objection.

20        (Exhibit 51.19 received into evidence.)

21   BY MR. PARK:

22   Q    Now, who was the source -- what was the code name for the

23   source that was involved in this operation?

24   A    ███████.

25   Q    And was ███████ outfitted with a recording device?

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes, sir.

 2   Q     And what happened after he was outfitted with that

 3   recording device?

 4   A     After we recover the crack cocaine and the recording

 5   device, we deactivate the recording device and brought it back

 6   to the FBI space, download the data onto a CD, sir.

 7   Q     Did ██████, when he returned, did he provide anything else

 8   to the FBI?

 9   A     Crack cocaine, about $400 worth of crack cocaine.

10   Q     And do you remember the quantity of the crack cocaine?

11   A     I do not remember, but for $400 crack cocaine, I would say

12   about half an ounce.

13   Q     Now, have you reviewed the entire recording of this

14   particular controlled purchase?

15   A     Yes, sir.

16   Q     And can you generally and briefly describe what you saw in

17   that recording.

18   A     ████████████ met up with us, wire him up.  He drove over to

19   122 West 58th Street, went inside.  And as soon as he walk in,

20   he make a call to somebody.  But based on the circumstances, I

21   believe he make a call to Mr. Jermaine Houston and say, "Where

22   you at?"  I'm on 58.  Come on."  Then he went inside a

23   residence and talking to somebody there roughly for five to

24   seven minutes, then I hear a knock on the door.  That's when

25   Mr. Jermaine Houston appear into the video with a little boy
```

1    about five to seven years old.

2    Q    But Jermaine Houston wasn't at the house initially?

3    A    No, he was not.

4    Q    And what happened next?

5    A    Then they greet each other.  And then I saw Mr. Houston

6    took out a bag, a white substance bag, and lay it on a counter

7    surface.  And he was fiddling with it for about a minute.  He

8    appear to be wrapping it up, getting ready.  And then I saw

9    Mr. Houston hand a white substance back over to the source.

10   Then the source count out -- you can see the money count out

11   like a stack of 20.  He counting out the money and hand it to

12   Mr. Houston, and then they walk out the house together.

13   Q    So Mr. Houston left the house after --

14   A    I believe they were walking out and talking at the same

15   time.

16   Q    Please take a look at Exhibits 177 to 179.

17        (Exhibits 177 to 179 for identification.)

18             THE WITNESS:  I did, sir.

19   BY MR. PARK:

20   Q    What are they?

21   A    They still image from the actual video recording of the

22   controlled purchase.

23             MR. PARK:  Your Honor, the Government moves to admit

24   Exhibits 177, 178 and 179.

25             MR. DIAZ:  No objection.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  No objection stated, it's received.
 2         (Exhibits 177 to 179 received into evidence.)
 3    BY MR. PARK:
 4    Q    Displaying 177, Agent Truong.  What do you see there?
 5    A    That's the front of 122 West 58th Street.
 6    Q    And, again, who's house is that?
 7              MR. EISNER:  Well, objection, Your Honor.  Again, it
 8    calls for hearsay information.
 9              THE COURT:  You can rephrase the question.
10    BY MR. PARK:
11    Q    Based on your experience on the task force, did you learn
12    whose house this was?
13    A    That's Mr. Anthony Ingram's house, sir.
14    Q    Displaying 178.  Agent Truong, what do you see there?
15    A    That's Mr. Jermaine Houston.
16              THE COURT:  And again, it's up to the jury to
17    determine whose house it is.
18    BY MR. PARK:
19    Q    Displaying 179.  Agent Truong, what do you see there?
20    A    That's the bag of crack cocaine that he handed to ███ --
21    to ███ .
22    Q    And by "he," are you referring to Jermaine Houston?
23    A    Mr. Jermaine Houston.
24              MR. PARK:  Your Honor, at this time I'd ask the
25    Court's permission to read into evidence a trial stipulation
```

**UNITED STATES DISTRICT COURT**

# EXHIBIT M

```
 1   Q    What's the move-in date for this tenant?

 2   A    It was October 17th, 2013.

 3   Q    Okay.  Sir, showing you 528.4.  What does the tenant

 4   ledger show?

 5   A    It has the tenant's name, the address, the dates when he

 6   first -- what do you call -- give us the deposit, the tenant's

 7   code, the property code, the unit code, the status, the rent,

 8   the deposit, the move-in date, the move-out date and the due

 9   date.

10   Q    What were the initial charges related to Mr. Ingram moving

11   into 122 West 58th Street on March 1st, 2009?

12   A    It was 2,400.

13   Q    Is that reflected under the "Payments" column?

14   A    Yes.

15   Q    What was the $2,400 for?

16   A    It would be 1,200 for the deposit and 1,200 for the rent.

17   Q    How would Mr. Ingram typically pay his rent?

18   A    Okay.  Based on this, it looks like he paid cash all the

19   time on this page.

20   Q    And where do you see where -- how are you saying that it

21   shows that he paid in cash?

22   A    Because whenever we input the rent, usually we put in

23   whether it's cash, check or money order.

24   Q    And so, for example, on April 4th, 2009, there is an entry

25   that reads "Cash April rent"?
```

|     |   |                                                             |
|-----|---|-------------------------------------------------------------|
| 1   | A | Yes.                                                        |
| 2   | Q | And that indicates that Mr. Ingram paid in cash?            |
| 3   | A | Right.                                                      |
| 4   | Q | If he paid in cash, how would he pay in cash?               |

11:12AM 5   A   With, I would say, dollar bills.

6   Q   Where would he take the cash?

7   A   He would bring it to the office.

8   Q   And, again, that office was the one in Silver Lake?

9   A   Yes.

11:13AM 10   Q   Would you be the one who received cash payments from

11   Mr. Ingram?

12   A   I received some cash from him.  I wouldn't say all of

13   them, but --

14   Q   But there were occasions --

11:13AM 15   A   Yes.

16   Q   -- where you received the cash payment from Mr. Ingram?

17   A   Yes.

18   Q   Do you recall how Mr. Ingram would get to the office?

19   A   Not all the time.  We did see him sometimes pull up with a

11:13AM 20   yellow city truck, you know, but that somebody else was

21   probably driving.

22   Q   You said somebody else was probably driving?

23   A   Yes.

24   Q   Why do you say that?

11:13AM 25   A   I don't know if they have -- we saw some people in it.

**UNITED STATES DISTRICT COURT**

# EXHIBIT N

```
 1    A       Primarily it's rock cocaine.

 2    Q       Based on your training and experience, what is the average

 3    weight of a quantity of rock cocaine that a typical street user

 4    would purchase from a gang member in South Los Angeles?

 5              MR. EISNER:  Objection; no foundation.

 6              THE COURT:  Overruled.

 7              MR. EISNER:  And vague and 403.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  Typically you would see anywhere

10    between .2 to about a gram.

11    BY MR. KETCHEL:

12    Q       When you say .2, that was 2/10 of a gram?

13    A       Yes, sir.

14    Q       And you said the range is from 2/10 of a gram to 1 gram?

15    A       Yes, sir.

16    Q       Based on your training and experience, are you familiar

17    with how many doses those quantities relate to?

18    A       Yes, sir.  It would depend on the actual user, but you

19    look at a tenth of a gram, it would be maybe one or two hits

20    from a tenth of a gram, to a gram, that could be anywhere

21    between seven to ten hits depending on the person.

22    Q       You said it depends on the person.  What factors are you

23    considering when you say it depends on the person?

24    A       Well, one person might not take a big -- might not inhale

25    more -- I mean, one person might inhale more than the other
```

**UNITED STATES DISTRICT COURT**

```
 1  person, so I have to take that into account.

 2  Q    Let's back up a second.  How is rock cocaine consumed?

 3  A    Predominantly by smoking it.

 4  Q    How is it typically smoked?

 5  A    Usually out of a pipe.  I have seen out of a glass

 6  cylinder pipe.  I have seen it out of -- I have seen someone

 7  use it off of Reynolds wrap.  It's usually smoked by some sort

 8  of smoking device.

 9  Q    And it comes in a crystalline form?

10  A    Rock cocaine?

11  Q    Yes.

12  A    No, it normally is an offwhite substance.

13  Q    But it's a hard substance?

14  A    A hard substance, yes, sir.

15  Q    And heat is applied to the substance?

16  A    Yes, sir.

17  Q    Which creates a fume?

18  A    Yes, which creates the smoke.

19  Q    And that's what's inhaled?

20  A    Yes, sir.

21  Q    So you said that one person may take a deeper breath or

22  inhale more smoke than another person?

23  A    That's correct, sir.

24  Q    In terms of the dosage, is dosage affected by the quality

25  of -- the purity of the crack cocaine?
```

A     Yes, it is.

Q     How is it affected?

A     Different -- different narcotic sellers or manufacturers,
they make it differently, so they might not make it as good as
the other person might make it.  So they might use a little
more what's called -- a substance called a cutter, they might
not use as much cutter, or they might use more cutter, and that
would depend on the quality of the rock cocaine.

Q     Can you basically describe for us the process by which
rock cocaine is manufactured.

A     It's usually you use water, baking soda as a cutter, and
basically they just boil that up and add -- they add the powder
cocaine, and eventually they dry it out, which would then form
the -- which would then form the rock cocaine.

Q     So were you describing before that -- and what's a cutter?

A     A cutter is just a substance that it can add to make
more -- to make it more -- make more rock -- they can use more
rock -- I'm sorry, use more powder cocaine.  So instead of them
using all the powder cocaine in the actual narcotics, they want
to cut it up so they can, you know, obviously make more --
more -- more rock cocaine with it, if you understand.

Q     Am I understanding correctly, you can create a higher
volume or greater volume of rock cocaine if you include more
cutter in the substance?

A     Yes, and you wouldn't have to use as much powder cocaine.

| | | |
|---|---|---|
| | 1 | Q    So a way of diluting the effect of the powder cocaine? |
| | 2 | A    Yes, sort of, yes. |
| | 3 | Q    So based on the purity, that will affect how many doses |
| | 4 | are within a particular weight of rock cocaine, correct? |
| 04:13PM | 5 | A    Wouldn't necessarily affect the dosage.  It would affect |
| | 6 | the quality of it, but -- |
| | 7 | Q    Would the quality affect the person's ability to have an |
| | 8 | effect from the rock cocaine that they smoke? |
| | 9 | A    Yes. |
| 04:13PM | 10 | Q    And if it is a lower purity rock cocaine, would that |
| | 11 | person typically want to smoke a higher volume of the rock |
| | 12 | cocaine in order to get the same effect? |
| | 13 | A    Yes. |
| | 14 | Q    Does the user's tolerance affect the dosage size? |
| 04:13PM | 15 | A    Yes, it does. |
| | 16 | Q    How does it affect it? |
| | 17 | A    It might take -- it might take a user that been using a |
| | 18 | while more to get high. |
| | 19 | Q    And that's compared to someone who has recently started |
| 04:13PM | 20 | using rock cocaine? |
| | 21 | A    Yes. |
| | 22 | Q    Street-level sales, how is rock cocaine typically ordered? |
| | 23 | What are the terms used to order rock cocaine at street-level |
| | 24 | sales? |
| 04:14PM | 25 | A    In my experience, it's been normally like street-level |

```
 1   sales, $10, I say give me a 10.  They say give me a 20 or

 2   either eight ball or a seven.  Eight ball is 3-1/2 grams of

 3   rock cocaine.  7 is 7 grams of rock cocaine.

 4   Q    I will get back into the weights in just a second, but

 5   when you say 10 or 20, what do does that refer to?

 6   A    $10 and $20.

 7   Q    So it's referring to the dollar amount?

 8   A    Yeah.

 9   Q    And approximately how much, in your experience, how much

10   is $20 worth of rock cocaine?  What is the weight of that,

11   typically?

12   A    The weight is typically around half -- a half a gram to a

13   gram.

14   Q    And -- okay.  Is there -- so when you say -- what would be

15   a standard price for a gram of rock cocaine?

16   A    A standard price could be anywhere between 20 to $25.

17   Q    And you testified earlier, I believe, that you've

18   interviewed individuals who sell rock cocaine on the streets in

19   South Los Angeles?

20   A    Yes, sir.

21   Q    Have you discussed how -- have you interviewed those

22   individuals about how they are supplied with the rock cocaine

23   that they sell?

24   A    Yes, sir.

25   Q    And have you discussed with them the quantities that they
```

04:14PM (line 5)
04:14PM (line 10)
04:15PM (line 15)
04:15PM (line 20)
04:15PM (line 25)

**UNITED STATES DISTRICT COURT**

1    purchased from their suppliers?

2    A     Yes, sir.

3    Q     What is the typical quantity, in your training and

4    experience, that a street level seller in South Los Angeles

04:15PM   5    would obtain from a supplier on a weekly basis?

6    A     On a weekly basis, you see an average street dealer

7    purchase up to half an ounce to an ounce depending on the area

8    they're in.

9    Q     How many grams are in an ounce, approximately?

04:16PM  10    A     Approximately about 28 grams.

11    Q     So a half an ounce is approximately 14 grams?

12    A     Yes, sir.

13    Q     And in your training and experience, would the person who

14    is purchasing the amounts that you just indicated, purchase

04:16PM  15    them all at once, or would they purchase them in smaller

16    portions over the course of the week?

17    A     They would purchase them in smaller portions over the

18    course of a week.

19    Q     What would those portions typically be?

04:16PM  20    A     Anywhere between either an eight ball, a 7 -- or I mean an

21    eight ball or 7 grams.

22    Q     Eight ball is how much weight?

23    A     3-1/2 grams.

24    Q     Is 7 grams effectively a quarter of an ounce?

04:17PM  25    A     Yes, sir.

1   Q   Is there a slang term used for an ounce of rock cocaine?

2   A   You hear "zone," "zips."

3   Q   What is the common purchase price for a quarter ounce,

4   7 grams of rock cocaine?

04:17PM  5   A   For 7 grams, it's around 250 to 350, $250 to $350.

6   Q   For an eight ball?

7   A   Eight ball is usually around 120 to $150.

8   Q   Half an ounce?

9   A   Half an ounce would go for around 500 to 7 -- 500 to $800.

04:17PM  10   Q   And an ounce?

11   A   An ounce was around a thousand dollars to 1100.

12   Q   The prices that you're quoting us, are those current-day

13   prices?

14   A   Yes, sir.

04:17PM  15   Q   If you were to consider what the price was approximately

16   four years ago, would that change?  Would the price change?

17   A   Yes, sir.

18   Q   How would it change?

19   A   It would be -- I believe around that time four years ago,

04:18PM  20   it was a little greater.

21   Q   Rock cocaine was more expensive then?

22   A   Yes, sir.

23   Q   Your training and experience, how would a street seller go

24   about selling an eight ball worth of rock cocaine, 3.5 grams?

04:18PM  25   A   My training and experience, they normally chop that eight

**UNITED STATES DISTRICT COURT**

# EXHIBIT Q



20140503_155450.jpeg

Exhibit 495



20140503_162625.jpeg

Exhibit 497

# EXHIBIT T

## Sample of Crack Purchases and Seizures by FBI
## From 52 Broadway Crips Investigation
## (Time Period 2011-2014)
## Total = 1033.87 Grams

| Evidence # | Drug | Net Weight (Grams) | Seller / Possessor | Date of Purchase / Seizure |
|---|---|---|---|---|
| 1B9 | Cocaine Base | 1.3 | Donald Ramsey aka "Du Low" | 4/7/2011 |
| 1B21 | Cocaine Base | 12.3 | Marquis Shaw aka "T-Loon" | 8/15/2011 |
| 1B22 | Cocaine Base | 5.5 | Marquis Shaw aka "T-Loon" | 8/17/2011 |
| 1B25 | Cocaine Base | 33.0 | Marquis Shaw aka "T-Loon" | 9/7/2011 |
| 1B31 | Cocaine Base | 13.6 | Bobby Bray aka "Night Out" / Antoine Tyars, Jr. aka "Lil Crazy A" | 9/28/2011 |
| 1B32 | Cocaine Base | 27.5 | Bobby Bray aka "Night Out" | 10/4/2011 |
| 1B33 | Cocaine Base | 27.6 | Antonio Dodds aka "Tone" / Andre Griffin aka "F-Bone" / Travis Bryant aka "Baby Dice" | 10/6/2011 |
| 1B34 | Cocaine Base | 6.7 | Andre Griffin aka "F-Bone" | 10/12/2011 |
| 1B35 | Cocaine Base | 41.0 | Johnnie Leggett / Monalisa Henderson | 10/12/2011 |
| 1B36 | Cocaine Base | 27.8 | Andre Griffin aka "F-Bone" | 10/19/2011 |
| 1B37 | Cocaine Base | 27.7 | Michael Bellinger aka "Big Mike" | 10/26/2011 |
| 1B38 | Cocaine Base | 27.7 | Michael Bellinger aka "Big Mike" | 11/3/2011 |
| 1B39 | Cocaine Base | 41.4 | Roosevelt Sumpter aka "TuTu" | 11/8/2011 |
| 1B40 | Cocaine Base | 13.5 | Antwan Collins aka "Tiny E" | 11/21/2011 |
| 1B41 | Cocaine Base | 26.9 | Antwan Collins aka "Tiny E" | 11/29/2011 |
| 1B42 | Cocaine Base | 14.0 | Kevin Campbell aka "Scooby" | 12/1/2011 |
| 1B43 | Cocaine Base | 55.4 | Antonio Dodds aka "Tone" / Andre Griffin aka "F Bone" | 12/13/2011 |
| 1B44 | Cocaine Base | 13.6 | Patrick Swaffi | 1/25/2012 |
| 1B45 | Cocaine Base | 13.3 | Sheronia Saunders aka "GG" / Gregory Gordon aka "Baby Lil Man" | 2/13/2012 |
| 1B46 | Cocaine Base | 25.7 | Gregory Gordon aka "Baby Little Man" | 2/21/2012 |
| 1B47 | Cocaine Base | 25.3 | Marquis Shaw aka "T-Loon" | 2/28/2012 |
| 1B49 | Cocaine Base | 12.4 | Marquis Shaw aka "T-Loon" | 3/22/2012 |
| 1B50 | Cocaine Base | 27.5 | Kevin Sims aka "Hot Box" / Juan Tyars aka "Big Brat" | 5/15/2012 |
| 1B52 | Cocaine Base | 17.1 | Leland Webster aka "Wimp" | 6/13/2012 |
| 1B53 | Cocaine Base | 31.4 | Leland Webster aka "Wimp" | 6/21/2012 |
| 1B58 | Cocaine Base | 27.1 | Timmy McCoy aka "Big Lee" | 8/22/2012 |
| 1B59 | Cocaine Base | 26.8 | Timmy McCoy aka "Big Lee" / Monalisa Henderson | 8/22/2012 |
| 1B63 | Cocaine Base | 27.4 | Patrick Swaffi | 9/6/2012 |
| 1B65 | Cocaine Base | 27.1 | Tyrine Martinez aka "Lil C Bone" | 9/18/2012 |
| 1B66 | Cocaine Base | 41.0 | Chris Burrell aka "Fly" / Anthony Wooley aka "Sneak" | 10/3/2012 |
| 1B69 | Cocaine Base | 27.4 | Juan Tyars aka "Big Brat" / Johnnie Leggett | 10/10/2012 |
| 1B77 | Cocaine Base | 34.4 | Juan Tyars aka "Big Brat" / Johnnie Leggett | 10/17/2012 |
| 1B80 | Cocaine Base | 59.9 | Tyrine Martinez aka "Lil C Bone" / Roosevelt Sumpter aka "TuTu" | 12/4/2012 |
| 1B82 | Cocaine Base | 7.8 | Jermaine Houston aka "J Bone" / Timothy Woods | 1/8/2013 |
| 1B119 | Cocaine Base | 28.3 | Derek Jones aka "Dirty D" | 9/27/2013 |
| 1B147 | Cocaine Base | 38.5 | Derek Jones aka "Dirty D" | 11/26/2013 |
| 1B471 | Cocaine Base | 3.3 | Patrick Swaffi | 6/17/2014 |
| 1B483 | Cocaine Base | 86.8 | Patrick Swaffi | 6/17/2014 |
| 1B525 | Cocaine Base | 28.9 | Johnnie Leggett | 6/17/2014 |

**Total Cocaine Base:**     1033.87

**Exhibit 191**

# EXHIBIT U

**Exhibit 145**

| Title III Wiretaps<br>Crack Sales Discussed<br><br>Estimated 1799.5 grams | | |
|---|---|---|
| **Line** | **Dates** | **Est. Total Crack Discussed** |
| **TT1 - Martinez ("C-Bone")** | **1/18/13 - 2/14/13** | **633 grams** |
| **TT1 - Martinez ("C-Bone")**<br>**TT2 & TT3 - Sumpter ("Tu Tu")** | **2/28/13-3/29/13** | **1,166.5 grams** |
| | | **Total: 1,799.5** |

Exhibit 193